IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RALPH J. CARTER, | ) | |
| | ) | |
| Plaintiff | ) | Case No. 1:18-cv-00096 (Erie) |
| | ) | |
| vs. | ) | |
| | ) | HON. RICHARD A. LANZILLO |
| ADAM BAUMCRATZ, | ) | UNITED STATES MAGISTRATE JUDGE |
| CODY WRIGHT, CO1 JOHNSON, | ) | |
| CO SMALLS, ZACHERY LUTZ, | ) | |
| CO BODDORF, ZACHERY TERMINE, | ) | MEMORANDUM OPINION ON |
| JORDAN DRAYER, | ) | DEFENDANTS' MOTION FOR |
| JEREMY COCHRAN, JANA JORDAN, | ) | SUMMARY JUDGMENT |
| CARL JOHNSON, | ) | |
| | ) | ECF NO. 110 |
| Defendants | ) | |

1.      Introduction

Plaintiff Ralph J. Carter ("Carter") filed this action pro se against several individuals

employed by the Pennsylvania Department of Corrections ("DOC") at the State Correctional

Institution at Forest ("SCI-Forest").  He asserts Eighth Amendment claims of excessive force,

failure to protect, and deliberately indifferent medical care pursuant to 42 U.S.C. § 1983.  He also

brings several state law tort claims against the Defendants.[1]  The Defendants have filed a motion for

summary judgment arguing that the use of force at issue was justified, that they were not deliberately

indifferent to any risk of harm or medical need, and that they are immune from Carter's state law

tort allegations.

---

[1] This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, and it can exercise supplemental
jurisdiction over the state-law claims under 28 U.S.C. § 1337.  All parties have consented to the jurisdiction of the
undersigned United States Magistrate Judge to conduct all proceedings in this case, including the entry of final judgment,
as authorized by 28 U.S.C. § 636.  *See* ECF Nos. 2, 11, 17.

Based on the video record, the Court holds that a reasonable jury could not find that the force used by the corrections officers was excessive or unreasonable under the circumstances they faced at the time.  Therefore, the Defendants are entitled to judgment as a matter of law on Carter' excessive force claim.  Summary judgment will also be granted on the remaining Eighth Amendment claims, and the Court will decline to exercise supplemental jurisdiction over Carter's state law claims.

2.    Procedural History

Carter's original Complaint was docketed on March 27, 2018.  ECF No. 4.  Defendants filed their Answer on June 26, 2018.  ECF No. 12.  The case was reassigned to the undersigned on September 25, 2018.  ECF No. 20.  Carter later filed a motion to amend his Complaint, which the Court granted on December 4, 2018.  ECF Nos. 32, 34.  The Amended Complaint was docketed on December 6, 2018.  ECF No. 35.  Carter added several individuals as new defendants in the Amended Complaint.[2]  The Defendants filed their Answer to the Amended Complaint on February 13, 2019.  ECF No. 48, which they later amended.  *See* ECF No. 69.

Carter sought leave to file a Second Amended Complaint on November 29,  2019.  ECF No. 75.  The Court granted Carter's motion, and the Second Amended Complaint was docketed December 9, 2019.  *See* ECF No. 77 (Order); ECF No. 79 (Second Amended Complaint).  The Second Amended Complaint is the operative pleading.  The Defendants filed an Answer on January 23, 2020.  ECF No. 89.  Upon the conclusion of a litigious period of discovery, the Defendants filed the instant Motion for Summary Judgment on August 21, 2020.  ECF No. 110.  Carter filed his brief in opposition to the motion on December 11, 2020.  ECF No. 142.  The Defendants' motion is now ripe for disposition.

---

[2] One of these individuals was Defendant William Sutherland, a certified nurse practitioner who was not employed by the DOC.  Defendant Sutherland filed a motion to dismiss (ECF No. 52), which the Court granted as unopposed. *See* ECF No. 65.

2

3.      Carter's Allegations and the Composition of the Record

Carter's claims arise from an incident at SCI-Forest on February 27, 2017.  ECF No. 79, ¶ 26.  Carter alleges that while being stripped searched before going out to the yard, he was discovered to be wearing two pair of boxer shorts in violation of a prison policy.  *Id.*, ¶ 36.  A disagreement ensued between Carter and Defendant Baumcratz.  After the strip search concluded, Baumcratz and Defendant Johnson began to escort Carter to the yard.  *Id.*, ¶¶ 42-43.  Baumcratz handcuffed Carter with a tether "attached to the chain link" and began to walk toward the yard area.  *Id.*, ¶¶ 43-45.  Carter acknowledges that "the conversation about the boxers continued the entire walk to the outside yard."  *Id.*, ¶ 51.  Carter claims that instead of proceeding to the yard, Defendant Baumcratz told him, "your yard is over."  *Id.*, ¶ 52.  At this point, the parties' version of the events diverge.

The Defendants contend that Carter became increasingly "non-compliant and continued to try and break free from the escort by pulling his right arm away from Baumcratz, prompting Baumcratz and Defendant Wright to attempt to gain control of Plaintiff."  ECF No., 112, ¶ 11.  The Defendants further contend that Carter spit on Baumcratz, hit him in the face, and called Baumcratz derogatory names.  *Id.*, ¶ 12.   Carter denies this.  ECF No. 143, ¶ 11.  The parties agree that after this exchange, Baumcratz and Carter placed Carter against a wall.  *See* ECF No., 112, ¶ 13; ECF No. 143, ¶ 13.

The summary judgment record includes security video footage of these events.  ECF No. 113-1 (Exhibits A and B).[3]  This footage includes both the DIVAR stationary surveillance camera recording and the video from a handheld camera operated by a corrections officer.[4]  The Court has

---

[3] Defendants' Exhibit A is entitled "Video 1 DIVAR, Camera J-Unit B-Pod," and Exhibit B is identified as "Video 2, Handheld Camera Footage."  ECF No. 113-1, p. 1.  As Defendants explained, "Exhibits A and B are contained on the same DVD."  *Id.*  They filed a scanned image of the DVD itself on the docket and sent the actual DVD to the Court in a separate mailing.  For clarification when discussing the video contents, the Court will use the exhibit labels in addition to the electronic case filing (ECF) number.

[4] Video from both the DIVAR and handheld camera runs continuously, without break.  The DIVAR footage is time-stamped with the time of day while the footage from the handheld camera begins when the recording starts.

carefully reviewed both recordings and finds that they present an accurate depiction of the incident in question.  The DIVAR surveillance video reveals:

| Video Time Code | Description |
| --- | --- |
| 7:35:11 AM | DIVAR video (Camera 221) begins; individuals visible in the background on first floor (partially obstructed by a stairwell (no audio is recorded for duration of incident) |
| 7:35:51 AM | Corrections Officers ("CO") seen escorting Carter (who is walking) |
| 7:35:59 AM | 2 COs are visible pushing Carter onto nearby wall |
| 7:36:03 AM | 4 COs present now; Carter is pushed onto cell block floor |
| 7:36:46 AM | Carter is brought to his feet and held against the wall |
| 7:36:52 AM | Officer approaches with a handheld video camera |
| 7:36:58 AM | Carter is escorted of the cell block |
| 7: 37:15 AM | DIVAR video footage ends |

The handheld video contains an audio track and begins after Carter has been subdued:

| Video Time Code | Description |
| --- | --- |
| 00:00 | HANDHELD camera footage begins with Carter being held against the wall |
| 00:06 | Carter is visible; being held against the wall; his feet are seen to be placed on the ground (one boot is on, the other foot just wearing a sock); Carter's left foot is seen to be flat on the ground; the other foot is on "tip toe," but his toes are on the ground |
| 00:08 | Carter begins to walk with the COs off the cell block |
| 00:17 | Officer operating handheld camera states, "apparently OC spray was deployed" |
| 00:35 | Carter arrives at treatment room off of the cell block and is seated on an examination bed |
| 00:50 | Officer "Johnson" takes over handheld camera operations |
| 01:04 | Carter informs Sgt. Cochran that he "has asthma" and that he "can't breathe" |
| 01:22 | Carter again states that he "can't breathe" and has "got asthma" |
| 01:25 | Off-camera CO responds, "good thing the PA is here" |
| 01:48 | Carter tells Sgt. Cochran he "can't breathe" and asks Cochran to "wash my face off;" Cochran tells Carter that "medical has to do it" |
| 02:09 | Carter asks to spit on the floor and COs provide with him a trash can instead |
| 02:25 | A physician assistant ("PA") arrives and approaches Carter |
| 02:30 | Carter is told "Medical is here" and "he's going to wash out your eyes" |
| 02:40 | The PA begins to wash Carter's eyes, but Carter turns his head away |
| 03:25 | PA again attempts to wash Carter's eyes but Carter continues to turn his head away |
| 04:07 | Carter asks for a cold towel to wipe his face |
| 04:38 | PA asks Carter if he can try to wash Carter's eyes out again |
| 04:49 | Carter is asked his inmate number; Carter provides it |

| Video Time Code | Description |
|---|---|
| 04:54 | Carter is asked if he wants his eyes rinsed out and he responds, "yes, but I can't breathe" |
| 05:02 | PA obtains a stethoscope and listens to Carter's breathing |
| 05:22 | PA completes breathing examination; does not indicate Carter is in any distress |
| 05:30 | Carter asks to be taken to his cell where he can wash his face |
| 05:45 | PA again attempts to rinse Carter's eyes out |
| 06:17 | PA successfully rinses Carter's eyes |
| 06:40 | Carter informed that a nurse from medical is "on her way down" |
| 06:42 | PA again washes Carter's face with a wet towel |
| 06:48 | Carter told "that's what the hold-up is" |
| 07:01 | Another off-camera voice says, "nurse will be here in a few minutes" |
| 07:39 | Carter asks for another towel, off-camera voice responds, "sure" |
| 08:31 | Carter again asks to go to his cell |
| 08:40 | Carter asks for another towel and is told to wait for medical personnel to arrive |
| 09:31 | Carter again asks to be put back in his cell but is told, "not until you've been seen by medical" |
| 11:57 | Nurse enters camera view and begins to photograph Carter |
| 12:10 | Carter asks nurse, "Miss, will you please wipe my face?" Nurse responds, "give me a second" |
| 12:31 | Nurse wipes Carter's face with a dry paper towel |
| 12:43 | Carter is stood up and begins to be escorted back to his cell |
| 13:23 | Carter arrives as his cell |
| 15:20 | Upon completion of cell inspection, Carter is returned to his cell |
| 15:42 | Handheld video terminated. |

*See id.*

The summary judgment record also includes documentary evidence. Carter has submitted discovery materials, medical documentation for a shoulder injury, a personal declaration as well as the declarations of three fellow inmates. *See* ECF No. 143-1. In addition to the video, the Defendants have produced incident reports, investigative summaries, Carter's grievance history, photographs and medical reports. *See* ECF No. 113.

Carter's Amended Complaint raises six distinct claims. Count I asserts a claim of excessive force under the Eighth Amendment against Defendants Wright, Smalls, Baumcratz, Johnson, and Lutz. ECF No. 79., ¶¶ 144-149. This claim concerns the application of OC spray. Count II alleges a failure to intervene claim against Defendants Baumcratz, Johnson, Termine, Lutz, Smalls,

Boddorf, Drayer, and Wright. *Id.*, ¶¶ 150-158. Here, Carter asserts that these Defendants violated his rights under the Eighth Amendment by not intervening to protect him from the excessive force inflicted against him by other prison personnel. *Id.* Count III is an Eighth Amendment denial of medical care claim against Defendants Baumcratz, Cochran, Wright, Lutz, Johnson, Termine, Drayer, Smalls, and Boddorf. *Id.*, ¶¶ 159-165. Here, Carter alleges that these Defendants failed to "contact the medical department whenever Plaintiff was having an asthma attack while in JB-1003 cell." *Id.*, ¶ 161. He also contends that these Defendants acted with deliberate indifference to his serious medical need by deploying OC spray against him despite his asthma and that Carter "was not medically cleared to be sprayed." *Id.*, ¶ 162. Finally, Counts IV, V, and VI allege state law claims of assault and battery, negligent infliction of emotional distress, and negligence against various Defendants. *Id.*, ¶¶ 166-182.

4.      Standards of Decision

Federal Rule of Civil Procedure 56(a) requires the court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether a genuine issue of material fact remains for trial, the court must view the record and all reasonable inferences to be drawn therefrom in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. Instead, once the movant satisfies its burden of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party must go beyond his pleadings with affidavits, depositions, answers to interrogatories or other record evidence to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "[A] pro se plaintiff is not relieved of his obligation under [Federal Rule of Civil Procedure] 56 to point to competent evidence in the record that is capable of refuting a defendant's motion for summary judgment." *Martin v. Wetzel*, 2021 WL 2926005, at *3 (W.D. Pa. July 12, 2021) (quoting *Damson v. Cook*, 238 F. Supp. 3d 712, 717 (E.D. Pa. 2017) (other citation omitted)). Put another way, just because a non-moving party is proceeding pro se, he is not relieved of their "obligation under Rule 56(c) to produce evidence that raises a genuine issue of material fact." *Id.* (quoting *Boykins v. Lucent Techs., Inc.*, 78 F. Supp. 2d 402, 408 (E.D. Pa. 2000)); *see also Winfield v. Mazurkiewicz*, 2012 WL 4343176, *1 (W.D. Pa. Sept. 21, 2012).

Further, under Rule 56, a defendant may seek summary judgment by pointing to the absence of a genuine fact issue on one or more essential claim elements. The Rule mandates summary judgment if the plaintiff then fails to make a sufficient showing on each of those elements. When Rule 56 shifts the burden of production to the nonmoving party, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. *See Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

Case 1:18-cv-00096-RAL   Document 152   Filed 09/28/21   Page 8 of 21



5.      Analysis and Discussion

5.1.    The Eighth Amendment Excessive Force Claim

Carter's first claim is that Defendants Wright, Smalls, Baumcratz, Johnson, and Lutz used excessive force in subduing him in violation of his rights under the Eighth Amendment. Specifically, Carter claims these Defendant used excessive force by:

- o  Slamming plaintiff into the wall;
- o  Tackling plaintiff to the ground;
- o  Smashing plaintiff's face into the ground;
- o  Yanking on the tether attached to the plaintiff's handcuffs;
- o  Applying their knees and elbows into plaintiff's back to cause pain;
- o  Spraying plaintiff with oleoresin capsicum excessively;
- o  Not allowing plaintiff to shower for over 7 days and fully decontaminate;
- o  Making callous and demeaning remarks to plaintiff; and
- o  Doing [the foregoing actions] for the very purpose of causing harm to plaintiff.

ECF No. 79, ¶ 145(A)-(I).

The Eighth Amendment prohibits prison officials from unnecessarily and wantonly inflicting pain upon incarcerated persons in a manner that offends "contemporary standards of decency." *Chaney v. Bednard*, 202 WL 7864202, at *7 (W.D. Pa. Dec. 31, 2020) (*Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). Its limitations include a prohibition on prison officials' using excessive force against inmates. *Matthews v. Villella*, 381 Fed. Appx. 137, 140 (3d Cir. 2010). In evaluating an excessive force claim, the "core judicial inquiry" is whether the force at issue "was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Chaney v. Bednard*, 202 WL 7864202, at *7 (W.D. Pa. Dec. 31, 2020) (*Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). Thus, an Eighth Amendment excessive force claim requires a showing of some subjective intent to injure. *Id.* (citing *Hudson*, 503 U.S. at 8-9). *See, e.g., Ball v. Beckley*, 2012 WL 3579583, at *13

(M.D. Pa. July 13, 2012), *report and recommendation adopted*, 2012 WL 3579614 (M.D. Pa. Aug. 17, 2012).

In determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, the court considers several factors, including: "(1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) 'the extent of the injury inflicted; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them'; and (5) 'any efforts made to temper the severity of a forceful response.'" *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir., 2000) (quoting *Whitley v. Albers*, 475 U.S. 312 (1986)). Summary judgment is not appropriate if the evidence, viewed in the light most favorable to the plaintiff, supports "a reliable inference of wantonness in the infliction of pain." *Griffin v. Moody*, 2021 WL 2826439, at *4 (E.D. Pa. July 7, 2021) (citing *Brooks*, 204 F.3d at 106).

Where the events at issue have been captured on video, the court must consider that evidence in determining whether a genuine dispute of material fact remains for trial. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007). The court must view the facts in the light depicted by the video. *Id.* (relying on a video recording in assessing summary judgment evidence and admonishing that the lower court "should have viewed the facts in the light depicted by the videotape"). At summary judgment, "where there are video recordings of the incident in question, [the court] need not adopt the non-movant's version of the facts if the recording 'blatantly contradict[s] the non-movant's version 'so that no reasonable jury could believe it.'" *McDowell v. Sheerer*, 374 Fed. Appx. 288, 291-92 (3d Cir. 2010) citing *Scott*, 550 U.S. at 380. If a review of the video "refutes an inmate's claims that excessive force was used against him, and the video evidence does not permit an inference that prison officials acted maliciously and sadistically, summary judgment is entirely appropriate." *Smalls v. Sassaman*, 2019 WL 4194211, at *8 (M.D. Pa. Sept. 4, 2019) (citing *Tindell v. Beard*, 351 Fed. Appx.

9

591 (3d Cir. 2009). *See also McCullon v. Saylor*, 2013 WL 1192778, at *14 (M.D. Pa. Mar. 4, 2013)

("[I]n assessing … claims in a case where an encounter is captured on video tape we are mindful of

the fact that when [the] 'videotape refutes [an inmate's] assertion that the defendant[s] used

excessive force,' or when the 'video shows that [an inmate] did not suffer any physical distress' …

we should conclude 'viewing the evidence in the light most favorable to [the inmate that] no

reasonable finder of fact could view the video of the incident and determine that [defendants] acted

maliciously and sadistically,' and may enter summary judgment on the excessive force claim.")

(quoting *Tindell*, 351 Fed. Appx. at 596).

   The correction officers' use of force against Carter is not disputed.  The videos show that

Carter was restrained, first against a wall and thereafter on the ground; the corrections officers then

carried Carter into a medical examination room.   The officers acknowledge that they also deployed

oleoresin capsicum (OC) spray during the encounter, although its use was so brief as to not be

observable in the videos.  Given this, the Court must consider each of the five *Whitley* factors, *supra.*,

to determine whether that force "was applied in a good-faith effort to maintain or restore discipline,

or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7.

   As to the first factor, Defendant Baumcratz reported in his DC-121 Employee Report of

Incident (Use of Force Occurrence) form that while he was escorting Carter from the showers to

the yard door, Carter "became aggressive and resistant, stating, 'why did you take my extra boxers,

next time just fucking take me back to my cell.'". ECF No. 113-1, p. 38.  Baumcratz records that he

informed Carter that his yard privileges were terminated and that Carter then attempted to "break

free from the escort." *Id.*  Baumcratz acknowledges attempting to place Carter against a wall with

the assistance of Defendant Wright. *Id.*  Baumcratz then stated that Carter

> turned his head towards this officer and spit stating "pussy."  Spit
> from inmate Carters (sic) mouth contacted this officers (sic) right side
> of face.  Inmate Carter was then placed against the wall.  Inmate
> Carter continued to resist and was placed on the floor.  Inmate Carter

> attempted to bite CO1 Johnson and OC was applied by CO1 Lutz to
> prevent the assault from continuing.  Inmate Carter was then brought
> to his feet and escorted to J unit Triage.

*Id.*

Although Carter acknowledges in his Amended Complaint that he called Baumcratz a disparaging name, the DIVAR surveillance video lacks audio and therefore sheds no light on the verbal exchange between Carter and the corrections officers.[5]  The video is also largely inconclusive on other aspects of the incident due to the camera's distance from the incident.  For example, the video does not corroborate or refute Baumcratz' contention that Carter spit on him.  It does, however, support Baumcratz' key contention that Carter attempted to escape from the officers escorting him back to his cell.  The video evidence clearly shows Carter's gait increase in an attempt to break away from the prison guards.  At 7:35:56, Carter's feet are placed squarely together as he proceeds towards his cell.  He walks normally in the next video frame, but then at 7:35:57, he materially increases his stride and pulls away from Baumcratz.  While Carter's motivation for increasing his stride and pulling away cannot be divined from the video, his movements reasonably communicated to Baumcratz and the other correctional officers a need to use force to maintain or regain control of Carter.  *Compare Conklin v. Todd*, 2019 WL 6619497, at *4 (W.D. Pa. Nov. 11, 2019).  This factor weighs in favor of summary judgment.  The reasonableness of a particular use of force must be assessed "from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight."  *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).

The second factor to consider is the relationship between the need for force and the amount of force used.  Defendants face liability if they acted with sadistic or malicious intent to cause pain.

---

[5] The summary judgment record includes declarations supporting that Carter's use of offensive language toward Baumcratz.  Carter's cellmate, Douglas Pugh, states that Carter called Baumcratz a "pussy."  ECF No. 143-1, p. 24, ¶ 19 ("Ralph responded saying I'm no pussy, your (sic) a pussy.").  Another inmate, Dorian Mitchell, states that "Carter responded "I ain't no pussy, pussy."  *Id.*, p. 52.  However, the Court finds that this factual issue is essentially irrelevant because name calling will rarely warrant a significant application of force.

*Ritchie v. Erie County Prison*, 2005 WL 3019128, at *4 (W.D. Pa. Oct. 26, 2005) (citing *Brooks v. Kyler*, 204 F.3d 102, 109 (3d Cir. 2000). The crucial inquiry is the manner of the infliction of the injury, not the injury itself. *Id.* (citing *Rhodes v. Robinson*, 612 F.2d 766, 771 (3d Cir. 1979). Here, the need for force weighed against the amount of force exerted favors summary judgment. The DIVAR video shows that the corrections officers needed to use force in response to Carter's resistance to the officers. Carter can be seen initially walking normally toward his cell, but then attempting to break away from the correctional officers who were escorting him. The correctional officers are then seen putting Carter against a nearby wall to regain control. Although the officers do so with a discernable degree of force, it cannot be said that the force used was disproportionate to that needed to obtain Carter's compliance. The video belies Carter's contention that the correctional officers "slammed" him into the wall and that he was held "off of his feet."

The DIVAR video continues its coverage and shows Carter continuing to resist the officers while they attempt to pin him against the wall. At 7:36:01, the video shows Carter attempting to remove or step away from the wall as two corrections officers attempt to keep in him in place. A second later, at 7:36:02, Carter fell to the ground. Now joined by three other guards, at 7:36:04, the corrections officers applied their weight to Carter's back and held him to the floor. While the use of OC spray cannot be seen on the video, the Defendants do not dispute that it was used. The record also includes evidence that medical had not approved Carter for the use of OC spray because of his asthma condition. Even if the corrections officers were aware of this restriction before the use of force incident, the use of OC spray was minimal and brief. Carter was secured and stopped resisting approximately ten seconds after being restrained on the floor. He remained on the floor for another thirty seconds—approximately 7:36:44 on the DIVAR video—when he was then brought to his feet and again placed against the wall. At 7:36:50, a corrections officer carrying a hand-held video camera entered the frame and recorded the officers taking Carter to the triage room. Importantly,

no officer is seen acting maliciously or sadistically towards Carter or inflicting any gratuitous force upon him. While the use of OC spray cannot be seen on the video, the Defendants do not dispute that it was used. The record also includes evidence that medical had disapproved Carter for the use of OC spray because of his asthma condition. Although the Defendants dispute Carter's assertion that he told the corrections officers of this restriction before they sprayed him, the Court accepts Carter's position for purposes of the pending motion for summary judgment. Nevertheless, the record establishes that the use of OC spray was brief. This is reflected in the absence of any reaction to the spray by the Defendants. Although they were in close contact with Carter at the time the spray was used, none of the officers on the video is seen to cough, wipe his eyes or otherwise react to it. Furthermore, the brief use of the spray did not induce Carter to experience an asthma attack and medical notes from Defendant Jordan note no other injuries to Carter. *See* ECF No. 1131-1, p. 35 (medical incident/injury report of Defendant Jordan noting no injuries and "no acute distress" to Carter after use of OC spray). *See also Martin*, 2021 WL 2926005, at *11. Thus, the evidence cannot support a reasonable jury's finding that the corrections officers' use of OC spray constituted an unnecessary and wanton infliction of pain upon Carter.

This conclusion in no way condones the officers' failure to abide by the medical prohibition on the use of OC spray against Carter. The Court acknowledges that the knowing disregard of restrictions imposed for the safety or health of inmates will often constitute compelling evidence of deliberate indifference. But prison rules do not define constitutional requirements or parameters, including those of the Eighth Amendment. *Njos v. United States*, 2015 WL 5965227, at *5 (M.D. Pa. Oct. 13, 2015) (citing *Beers–Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir.2001)). And in this case, the record considered in its entirety does not evince an intent on the part of the corrections officers to maliciously or unnecessarily inflict pain, even considering their brief, unauthorized use of OC spray.

Instead, the videos show that the force used to secure Carter's compliance with their instructions was reasonably calibrated to meet the resistance and circumstances confronted by the officers.

The third *Whitley* factor considers the extent of the injury inflicted; this factor also favors summary judgment. Here, the absence of any significant injury weighs against an inference of an excessive force, but it is not dispositive. *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."). Defendants point out that any injuries Carter suffered were minimal and associated with OC spray exposure. ECF No., 111, p. 7. *See Martin,* 2021 WL 2926005, at *11 (citing *Gibson v. Flemming*, 837 Fed. Appx 860, 862 (3d Cir. 2020) (holding that a "temporary discomfort of the OC spray" did not support a constitutional violation); *Jones v. Wetzel*, 2017 WL 4284416, at *8-10 (M.D. Pa. Sept. 27, 2017). Further, they point out that Carter was immediately decontaminated by the medical department and was found not to be in respiratory distress or to have suffered any other injuries. *Id.* This is noted in the contemporaneous medical records and can be clearly seen on the handheld video. *See* ECF No. 113-1, p. 35.

Carter claims that he suffered a shoulder injury during the incident that required surgery. ECF No. 142, p. 5. He has submitted medical records to support this claim. None of these medical records, however, connect this shoulder injury to the events of February 27, 2017. The first notation concerning a shoulder injury appears on a medical chart dated May 26, 2017, some three months after the use of force incident. ECF No. 143-1, p. 46. Carter was referred to physical therapy and was to be evaluated after completion of that treatment. *Id.* A consultation record dated July 20, 2018 indicates Carter received physical therapy. *Id.*, p. 45. Another consultation record, this one dated October 19, 2018, indicates that Carter was sent to Allegheny General Hospital in Pittsburgh, Pennsylvania for treatment of an unspecified shoulder/arm sprain. *Id.*, p. 43. This

record does indicate that Carter "has R shoulder pain since injury 1 year ago." *Id.* This would indicate that Carter was injured in October of 2017—not February of that year. Finally, records from the date of Carter's shoulder procedure on November 5, 2018 describe the nature of his injury as "unspecified." *Id.*, p. 38. Thus, the record does not reasonably connect Carter's shoulder injury to the use of force incident on February 27, 2017.

The fourth *Whitley* factor examines the extent of the threat to the safety of staff and other inmates as reasonably perceived by the responsible officials based on the facts known to them. 472 U.S. at 322. This factor weighs slightly in favor of summary judgment, albeit only slightly. While Carter was uncooperative and attempted to pull away from the guards who were escorting him back to his cell, the video does not show him aggressing towards the guards. He would have presented a potential threat to the corrections officers, however, had he succeeded in breaking away from them.

An examination of the fifth *Whitley* factor also supports summary judgment because the record demonstrates that the Defendants made "efforts … to temper the severity of a forceful response." *Brooks*, 204 F.3d at 106. Here, video evidence establishes that, after Carter's attempt to break away, the officers first placed him against the wall, then as Carter continued to resist, they took him to the floor. Corrections officers did not use batons or strike any blows against Carter. The video also shows them promptly reducing their use of force as they regained control of Carter. Immediately after they regained control, the corrections officers promptly took Carter to the medical department for assessment and decontamination.

Thus, all five factors support summary judgment in favor the Defendants on Carter's excessive force claim. No reasonable jury could conclude that the officers used excessive force against Carter on February 27, 2017.

5.2     Defendants Baumcratz, Johnson, Termine, Lutz, Smalls, Boddorf, Strayer, and
Wright are entitled to summary judgment on Carter's failure to intervene claim.

Carter also brings an Eighth Amendment "failure to intervene" claim against Defendants

Baumcratz, Johnson, Termine, Lutz, Smalls, Boddorf, Strayer, and Wright.  He claims their failure to

intervene during the events of February 27, 2017 violated his rights under the Eighth Amendment.

"[A] corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth

Amendment violation under § 1983 if the corrections officer had a reasonable opportunity to

intervene and simply refused to do so." *Brewer v. Smith*, 2021 WL 3123893, at *4 (W.D. Pa. July 22,

2021) (quoting *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002).  To impose liability under this

theory, Carter must produce evidence to show that the Defendants "ignored a realistic opportunity

to intervene" in an assault.  *Poindexter v. Kauffman*, 2021 WL 1212585, at *4 (M.D. Pa. Mar. 31, 2021)

(citations omitted).  He has failed to do so.

Having failed to demonstrate a factual basis for his excessive force claim, there can be no

claim for failure to intervene or protect.  *See Nifas v. Coleman*, 528 Fed. Appx. 132, 136 (3d Cir. June

2013); *Wardell v. City of Erie*, 2015 WL 6134014 (W.D. Pa. Oct. 16, 2015) ("If there is no excessive

force, then there is no corresponding duty to intervene."); *see also Rosser v. Donovan*, No. CV 16-381

(MN), 2020 WL 5891542, at *7 (D. Del. Oct. 5, 2020) (citing *Nifas*).  The force exerted by the

Defendants in this case was objectively reasonable under the circumstances.  Hence, Defendants had

no duty to intervene or protect.  Therefore, the Court will grant the motion for summary judgment

on this claim.

5.3     Defendants are entitled to summary judgment on Carter's Eighth Amendment
deliberate indifference to medical need claim.

At Count III, Carter maintains that the Defendants violated his rights under the Eighth

Amendment by failing to contact the medical department after he suffered an asthma attack and that

they were deliberately indifferent when they deployed OC spray on him because he was not

medically cleared for such disciplinary action. *See* ECF No. 79, ¶¶ 159-165. Carter's first claim is plainly contradicted by the record. He claims that the Defendants failed "to contact the medical department whenever plaintiff was having an asthma attack." ECF No. 79, ¶ 161. To the extent Carter is referring to his treatment following the incident on February 27, 2017, the videos clearly show that Carter was promptly taken to the medical department for decontamination, assessment, and treatment. The record does not support that Carter experienced an asthma attack on February 27, 2017. To the extent Carter is referring to other incidents where he alleges the Defendants failed to respond to an asthma attack, he does not offer any evidence to support this general allegation. He does not identify any specific instances by date or otherwise when such neglect allegedly occurred. General allegations that omit any supporting acts or omissions cannot support a claim of deliberate indifference. *See, e.g., Chmiel v. Pennsylvania Dep't of Corr.*, 2020 WL 1332830, at *7 (W.D. Pa. Mar. 23, 2020). Indeed, generalized allegations like Carter's "which do not show the facts in detail and with precision are insufficient to prevent the award of summary judgment." *Robin Const. Co. v. United States*, 345 F.2d 610, 613 (3d Cir. 1985).

Carter's other claim of deliberate indifference fairs no better. Here, he argues that Defendants Baumcratz, Cochran, Wright, Lutz, Johnson, Termine, Drayer, Smalls, and Boddorf were deliberately indifferent to his serious medical condition (asthma) when they used OC spray against him despite a medical prohibition against doing so. ECF No. 79, ¶¶ 161-62. He maintains that he told these Defendants that he had asthma, was not medically cleared for the use of OC spray, and that they knew of his condition because they had previously escorted the prison nursing staff during rounds when he received his daily asthma medication. ECF No. 142, p. 9. Defendants dispute Carter's contention that he told them he was not medically cleared for OC spray use and that Carter told them he had asthma prior to being sprayed. ECF No. 143-1, p. 8, ¶ 20-21. But Carter has proffered a DOC "Use of Oleoresin Capsicum" form from 2008 which contains a

notation that Carter has "severe asthma." According to this form, Carter's asthma "precludes the use of OC." ECF No. 143-1, p. 11. A "physician's order form" dated February 25, 2008, confirms that the use of OC spray is not authorized against Carter due to "severe asthma." ECF No. 143-1, p. 12. This form was signed by a Dr. David Underwood and appears to have originated from SCI-Mahanoy. *See id.* A progress note dated June 11, 2016 again indicates that Carter was "not medically cleared for OC spray." *Id.*, p. 13.

At the outset, the Court notes that this evidence relates more directly to Carter's excessive force claim than his deliberate indifference to serious medical needs claim. This is because Carter makes no argument that these Defendants deprived him of medical treatment or rendered treatment that was somehow deficient. Instead, he complains that these Defendants were deliberately indifferent to his health and safety when they deployed OC spray against him despite his not being medically cleared for OC spray. ECF No. 79, ¶ 162 ("Defendants showed deliberate indifference by administering OC on plaintiff despite him announcing his acute asthma condition and the fact that he was not medically cleared to be sprayed."). For the reasons discussed above, the Defendants' use of force, including the unauthorized use of OC spray, did not rise to the level of an Eighth Amendment violation. *See, e.g, Gibson*, 837 Fed. Appx. at 862 ("temporary discomfort of the OC spray" did not support a constitutional violation); *Jones*, 2017 WL 4284416, at *8–10 (OC spray-induced asthma attack insufficient injury). Again, the Court does not condone the officers' failure to abide by this restriction. It simply notes that based on the entire record in this case, the brief use of OC spray was proportionate to the situation faced by correction officers.

And even if Carter's claim could be construed as one alleging deliberate indifference, it would fail. For deliberate indifference claims, courts in this Circuit distinguish between non-medical prison officials—typically corrections officers—and medical prison officials—doctors and nurses providing medical care. *Williams v. Doe*, 2017 WL 4680636, *3 (E.D. Pa. Oct. 18, 2017). *Id.* (citing

*Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) (finding non-medical prison official not chargeable with Eighth Amendment scienter required of deliberate indifference) (emphasis added).[6] Here, these Defendants are all non-medical personnel—according to Carter's Complaint, they are corrections officers—and are not responsible for directly rendering medical care. *See* ECF No. 79, ¶¶ 11-19. *See also Trainor v. Wellpath*, 2021 WL 3913970, *10 (W.D. Pa. Sep. 1, 2021). Nor does Carter contend that any of these Defendants are responsible for his medical care. Thus, "[t]o state an Eighth Amendment claim of deliberate indifference against" non-medical corrections personnel, Carter must point to evidence demonstrating that they "possessed actual knowledge or a reason to believe that 'prison doctors or their assistants [were] mistreating (or not treating)' him." *Id.* (quoting *Spruill*, 372 F.3d at 326). Nothing in the record supports such a contention and Carter does not even argue that these Defendants had any knowledge that prison medical personnel were somehow mistreating him. Nor does Carter contend these Defendants provided him with medical care. Thus, because none of these Defendants are "trained members of the medical staff," they cannot be subjected to liability for an Eighth Amendment claim. *Ortiz v. Alexander*, 2021 WL 1093633, at *9 (M.D. Pa. Mar. 22, 2021) (citing *Spruill*, 372 F.3d at 236).

And although a non-medical defendant's refusal to follow a medical directive can, in some circumstances, constitute deliberate indifference, that is not the case here. *See McClintic v. Pennsylvania Dept. of Corrs.*, 2013 WL 5988956, at *10 (E.D. Pa. Nov. 12, 2013). For a corrections officer to be liable, the inmate-plaintiff must show that the officer knew of and disregarded an excessive risk to the prisoner's health. *Perkins v. Schwappach*, 399 Fed. Appx. 759, 761 (3d Cir. 2010) (citing *Farmer v.*

---

[6] In *Spruill*, the Court of Appeals for the Third Circuit stated: "If a prisoner is under the care of medical experts ... a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor. Moreover, under such a regime, non-medical officials could even have a perverse incentive not to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability." *Spruill*, 372 F.3d at 236.

*Brennan*, 511 U.S. 825, 837 (1994)).  Even if the corrections officer knew of a risk to the prisoner's health, he must still personally draw the inference that the prisoner faced a substantial risk of serious injury.  *Id.*

This claim fails because even assuming the Defendants knew of the risk OC spray posed to Carter's health, the conduct must still be objectively harmful enough to violate the Constitution. *Gibson*, 837 Fed. Appx. at 862 (citing *Wilson v. Seiter*, 510 U.S. 294, 298 (1991)).  As revealed by the video evidence, the discomfort and irritation the OC spray caused to Carter's eyes was not serious. No other injuries associated with the use of OC spray are supported by the record.  Indeed, Carter is shown to have experienced only minor discomfort due to his exposure to OC spray.  Although the handheld video does show him stating that he cannot breathe, the attending medical personnel examined Carter with a stethoscope and noted he was not in any distress.  ECF No. 113-1, at 5:02; 5:22.  Furthermore, Carter is repeatedly shown to be breathing normally and he continues his conversations with corrections officers and medical personnel without any apparent difficulty.  *See id.*, at 1:04; 1:48; 4:54; 5:02.  Carter is not shown to be suffering from an asthma attack or related symptoms at any time.  *Id.*

Carter has failed to meet his burden to produce evidence that he suffered material injury as a result of the use of OC spray.  Consequently, Defendants are entitled to judgment in their favor on Carter's Eighth Amendment deliberate indifference claim.

5.4     The Court will not exercise supplemental jurisdiction over Carter's state law tort claims.

Finally, Carter brings several tort claims under state law.  At Count IV, he raises state law claims of assault and battery against Defendants Baumcratz, Wright, Smalls, Lutz, and Johnson. ECF No. 79, ¶¶ 166-169.  At Count V, he alleges negligent infliction of emotional distress against those same Defendants.  *Id.*, ¶¶ 170-173.  He again raises negligent infliction of emotional distress in Count VI, this time against all Defendants.  *Id.*, ¶¶ 174-182.

The court may decline to exercise supplemental jurisdiction over state law claims if it "has dismissed all claims over which it has original jurisdiction." *Lemmons v. Cty. of Erie Pennsylvania*, 2020 WL 4041551, at *6 (W.D. Pa. July 17, 2020) (citing 28 U.S.C.A. § 1367(c); *Whitenight v. Elbel*, 2019 WL 6828653, at *10 (W.D. Pa. Dec. 13, 2019)).   The Court of Appeals for the Third Circuit has recognized, "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)).   No such considerations support this Court continuing to exercise supplemental jurisdiction in this case.   Accordingly, the Court declines to exercise supplemental jurisdiction over Carter's state law claims.

6.      Conclusion

Based on the foregoing, the Defendants' motion for summary judgment will be **GRANTED**, and judgment will be entered in favor of all Defendants on Plaintiff's claims under federal law.   The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, and these claims will be dismissed without prejudice to Plaintiff's ability to refile them in an appropriate state forum.   An order follows.

Submitted this 28th day of September, 2021.


HON. RICHARD A. LANZILLO
United States Magistrate Judge